**Eleanor A. HENDRICKSON et al.,
Plaintiffs,**

v.

**Keith WILSON, as Director, and State
Waterways Commission, et al.,
Defendants.**

**No. G–26–73 CA.**

United States District Court,
W. D. Michigan, S. D.

March 30, 1973.

Opinion on the Merits Aug. 30, 1973.

James R. Williams, Sutton's Bay, Mich., Robert A. Hendrickson, New York City, Vander Veen, Freihofer & Cook by Peter W. Steketee, Grand Rapids, Mich., for plaintiffs.

Warren R. Snyder, Asst. Atty. Gen. of Mich., Lansing, Mich., Frank S. Spies, Grand Rapids, Mich., for defendants.

## OPINION

ENGEL, District Judge.

Plaintiffs Hendrickson are taxpayers and property owners in Leland, a small community on the shores of Lake Michigan in Leelanau County, this district. In this action they seek to enjoin the further planned expansion of Leland Harbor by the state defendants and those acting under them. They invoke the original jurisdiction of this court under the Constitution and laws of the United States and the pendent jurisdiction of the court with reference to certain claims against state defendants.

The court makes an initial and preliminary determination of subject matter jurisdiction under 28 U.S.C. § 1331(a).

Defendants are the Michigan Department of Natural Resources and two of its agencies, the Water Resources Commission and Waterways Commission as well as the Waterways Commission's director. Also made a defendant is the Corps of Engineers of the United States Army, as issuer of the permit under which the planned expansion is going forward.

Plaintiffs allege that prior to 1968, Leland Harbor and adjacent town were unpolluted and the area "was one of the most attractive and picturesque small village lakefront areas in the Middle West"; that in 1968 defendants through concerted action constructed the present boat launching and docking facilities in Leland, that in doing so they altered and destroyed much of the natural beauty of the area; that the project as completed attracted many people to the area causing over-utilization of the facilities, disrupting the status quo of the area, precipitating a breakdown of the septic system installed by defendants and polluting the surrounding environment.

Plaintiffs further contend that defendants now contemplate expanding the present facilities even further; that if such expansion takes place, plaintiffs personally as well as the class they seek to represent will suffer similar irreparable injuries. Thus this suit was initiated to block further expansion projects affecting the Leland harbor area.

Plaintiffs charge the defendants with failure to comply with federal and state anti-pollution laws. Included are allegations that defendant Corps of Engineers has failed to comply with the provisions of the National Environmental Policy Act, 42 U.S.C.A. § 4321 et seq.; and that the leasing agreement, under which the

State Waterway Commission is now operating and pursuant to which the Commission seeks expansion of onshore facilities, is void for failure to comply with state law.

On February 12, 1973, this court held a hearing upon plaintiffs' motion for preliminary injunctive relief. At that hearing the parties submitted documentary and testimonial evidence in support of their respective positions. The parties were given until March 7, 1973 to present further briefing on the legal questions presented by plaintiffs' motion.

 The issue now before the court is whether a sufficient showing has been made by plaintiffs to warrant the granting of preliminary injunctive relief which will maintain the status quo until the court has had the opportunity to hear the matter on the merits and to consider more fully the many potential legal and factual issues which are raised.

If the position of the plaintiffs is ultimately correct, the court is satisfied that the proposed action of the defendants could cause irreparable injury for which there would be no adequate remedy at law or otherwise after the fact. The facts indicate that defendants do intend to commence the proposed improvement and expansion in the near future and before the court could hear the matter on the merits. At least one of the issues is whether the Army Corps of Engineers should have prepared an environment impact statement pursuant to 42 U.S.C.A. § 4332 before issuing the permit for the work. Defendants admit no such statement was prepared, but claim that the project involved here is not a "major federal action" significantly affecting the quality of the human environment. 42 U.S.C.A. § 4332(C). Although the Corps of Engineers itself will not be making the improvements, its

prior permission is an essential condition. The proofs at the hearing show that in fact a contract has been let for the expansion of harbor facilities for a total cost of $81,300.00 to commence as soon as practicable and to be completed by June 15, 1973. Although the community and harbor are small, the court cannot say that in the context here and without further investigation into the facts and circumstances that the proposed action does not amount to a major federal action.

Without making any final determination on the issues, suffice it to say that a sufficient showing has been made to warrant preliminary relief, especially in view of irreversible nature of the proposed work and in view of the policies and goals of Congress as expressed in the National Environmental Policy Act of 1969. 42 U.S.C. § 4331(a).

The court will make every reasonable effort to bring this matter promptly to a conclusion so as to minimize any consequences to the defendants which may later be shown to have been unjustified and it is expected that the parties will promptly prepare themselves for a hearing on the merits at the earliest available opportunity. This could perhaps be accomplished in large part by stipulation of facts and submission of briefs. The parties are urged to consider this.

Still under advisement and not decided here are plaintiffs' application to have this suit treated as a class action and the motion to intervene.

Specifically excluded from any preliminary injunctive relief are the normal and customary maintenance activities of the defendants in the harbor area.

## OPINION ON THE MERITS

The original named plaintiffs are property owners in the Leland Harbor area.[1] The defendants include the Mich-

---

1. The plaintiffs requested that this court order that their suit be maintained as a class action pursuant to F.R.Civ.P. 23. The court denied plaintiffs' request for class action status, but did allow 175 or more co-plain- tiffs' actions to be consolidated with the original plaintiffs' action pursuant to F.R. Civ.P. 42(a). See docket entry 55 for court's order.

igan Waterways Commission and its director, Keith Wilson, the Michigan Department of Natural Resources, and the Corps of Engineers of the United States Army.[2] Plaintiffs' lawsuit seeks to enjoin the defendants from proceeding with the contemplated expansion of Leland Harbor until an environmental impact statement under the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) is filed with respect to the project. Plaintiffs' complaint also sets forth various grounds for pendent relief against the defendants based on Michigan law.

Evidence available to the court, in addition to the testimony and exhibits received at trial, includes a view of the harbor and surrounding area taken by the court in the presence of counsel for the parties on June 16, 1973. Proofs also include a stipulation of material facts and the testimony and exhibits received at the February 12, 1973 hearing on plaintiffs' motion for a preliminary injunction.

## Position of the Parties

Plaintiffs contend that the Leland Harbor expansion plan involves both federal and state action, and that the proposed plan is "major" and "significantly" affects the human environment there. Therefore, plaintiffs submit that the defendants should be enjoined from proceeding with their announced plans for Leland Harbor expansion until they file appropriate environmental impact statements as required by federal law (42 U.S.C. § 4332 [2][C]) and state law (Governor's Executive Directive 1971–10).

The defendant Corps of Engineers and the State defendants assert that the proposed project at Leland Harbor is not a "major federal action" and has no significant effect upon the environment.

The State defendants further allege that Governor's Executive Directive 1971–10 is nothing more than a recitation of policy and does not have the force and effect of law.

## Issues

The issue in the case involving federal law is whether the determination of the defendant Corps of Engineers that the project here was not a major federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act was unreasonable or arbitrary or capricious.

The issue in the pendent claim is whether the State defendants complied with Governor's Executive Directive 1971–10 and the Guidelines for Implementing State of Michigan Executive Directive 1971–10 prepared by the Michigan Advisory Council for Environmental Quality, and if not, whether such failure is a proper basis for the injunctive relief which plaintiffs seek.

## Findings of Fact

Leland Harbor is a highly picturesque small harbor on the coast of Lake Michigan in northern Leelanau County. Its focal point is a colorful fishing village which lies on both sides of the channel of the Carp River. Fishermen for years have engaged in commercial fishing in the area contributing to its picturesque setting.

In 1966 a harbor of refuge was constructed at Leland by the United States Corps of Engineers, in cooperation with the Michigan State Waterways Commission and the Township of Leland. The existing harbor facility consists of the following:

1. Two rubblemound breakwaters enclose and protect the basin and accommodations, a northerly breakwater

2. The court recognizes that defendant Corps of Engineers asserted in its answer that it could not be sued eo nomine. See docket entry 25. At the pretrial conference, however, the parties agreed that there was no need to hold up the proceedings on this account, and that if a technical correction was required, the plaintiffs would provide a stipulation for substitution of parties. See transcript of pretrial conference, pages 2 and 3, docket entry 51.

about 1,250 feet long, and a southerly breakwater about 450 feet long.

2. A 3-acre anchorage basin 10 feet deep.

3. An entrance channel leading from the 12-foot contour in Lake Michigan to the anchorage area.

4. A tee-shaped main pier with stem 180 feet long and crossbar 350 feet long with 14 finger piers attached to the crossbar capable of mooring 32 small craft. Services provided on the pier consist of individual electric and water connections for each boat and fuel and sewage pump-out accommodations at the south end of the main pier.

5. A face brick toilet building on shore approximately 24 by 33 feet, contains four stall showers with individual dressing rooms, five water closets, one urinal and four lavatories, and a storage and electrical-mechanical room 144 square feet in area. The effluent from the toilet building empties into a 2,500-gallon septic tank and 2,500-square-foot tile field.

6. A concrete-surfaced launching ramp with service pier. This ramp, 24 by 68 feet, extends from the parking area into the water, sloping downward to a depth of about 3 feet below International Great Lakes Datum.

7. A one-acre asphalt-paved parking lot accommodating 24 autotrailer rigs and 29 automobiles.

Items 1 through 3 were built and are maintained by the U. S. Army, Corps of Engineers. Items 4 through 7 were jointly constructed by the Township and the Commission and are maintained by the Commission.[3]

The Corps of Engineers on March 22, 1968 issued a permit to the State for the construction of marina facilities consisting of a pier having 14 finger piers and a concrete boat ramp at Leland Harbor (items 4 and 6 above), and the work was completed on or before January 1, 1970. Keith Wilson, Director of the Michigan Waterways Commission, testified at the February 12, 1973 hearing that the original plans contemplated a longer main pier and additional finger piers, but due to lack of funds the additional finger piers were not included in the permit issued in 1968.

The State defendants now desire to extend the main pier and construct additional finger piers. On March 13, 1972 defendant Michigan Department of Natural Resources applied to defendant Corps of Engineers for a permit to expand the existing mooring facility by extending the northerly end of the crossbar of the tee of the main pier approximately 140 feet, by adding eight finger piers to the extension, and by dredging around such piers to the depth of six feet. On June 1, 1972 the defendant Corps of Engineers issued permit number 72–56–11 to the Michigan Department of Natural Resources for the proposed work at Leland Harbor.

Mr. Thomas Ottenbacker, Chief of the Permit Section for the Detroit District of the Corps of Engineers, testified that upon receipt an application for a permit is given a process number, reviewed as to possible environmental effects, and a public notice of each application is then prepared and sent to various federal and state agencies and other interested groups. Mr. Ottenbacker stated that the Detroit District received approximately 750 applications for permits between July, 1971 and July, 1972 and approximately 800 permit applications between January 1 and June 18, 1973.

The district engineer has the initial responsibility to determine whether or not an environmental impact statement must be issued for a particular project. It was Mr. Ottenbacker's testimony, however, that if one objection to the project is received as a result of the

---

3. This description of the existing facility is taken from page 2 of plaintiffs' trial exhibit 5, which is entitled an "Environmental Assessment and Declaration of No Significant Impact prepared by Waterways Division for Expansion to Mooring Facilities Leland Harbor".

public notice, then the district engineer does not have the authority to issue the permit until the objection is satisfactorily resolved.

The application involved here was prepared by the Michigan Department of Natural Resources and was received by the Detroit District of the Corps of Engineers on March 13, 1972, being assigned the number 72–56–11. The application sought permission to "construct mooring facilities and dredge to a minimum depth of 6 feet below International Great Lakes Datum" at Leland Harbor. No federal funds were to be involved, the estimated $81,300 cost being borne by the State.[4]

Public notices, which contained the request of the Michigan Department of Natural Resources, maps of the affected area, and diagrams of the proposed work were sent to numerous agencies and interested parties including, but not limited to, the following: Environmental Protection Agency; Fish and Wildlife Service of the United States Department of the Interior; Bureau of Outdoor Recreation for the Lake Central Region of the United States Department of the Interior; National Park Service; Sierra Club, Mackinac Chapter; Leelanau County Board of Supervisors; Leelanau Board of County Road Commissioners; Editor of the Leelanau Enterprise; Leland Township Supervisor; and Michigan United Conservation Club.

Mr. Ottenbacker testified that no objections to the project were registered by any federal or state agency or by private individuals or groups. Mr. Ottenbacker also indicated that he did not have any knowledge that the project involved any more than the additional mooring facilities and the dredging around such facilities.

Permit 72–56–11 was granted on June 1, 1972 by Major Thomas Woodall, Acting District Engineer for the United States Corps of Engineers in Detroit. Major Woodall testified that he determined that it was not necessary to issue an environmental impact statement prior to the issuance of this permit, after reviewing the application file and ascertaining that there was no indication from any agency, individual, or in-house disciplinary group that any degradation or impact would evolve from the addition of the finger piers to the Leland structure.

In addition to work authorized under the permit, there was considerable proof going to proposed on-shore improvements for the Leland Harbor area by state agencies. There is no evidence of federal involvement in this aspect of the harbor expansion. From the testimony at trial it appears that the Michigan Department of Natural Resources desires to expand and upgrade the existing facilities at Leland Harbor by taking the following proposed actions:

1. Restroom Facility:

(a) Constructing an addition to the toilet building, approximately 105 square feet in area. This will accommodate the addition of two water closets and two lavatories.

(b) Replacing the existing 2,500 gallon septic tank with a 10,000 gallon septic tank.

(c) Replacing the existing 2,500 square foot tile field with a 15,000 square foot tile field.

2. Launching Facility:

(a) Adding a launching ramp adjacent to and southerly of the existing launching ramp and installing a service pier between the ramps.

(b) Relocating the access road to the site from the south side at the foot of River Street to the north side at the foot of Pearl Street.

(c) Developing a parking area for an additional 110 autotrailer rigs.

4. On November 7, 1972 the State of Michigan entered into a contract with Roen Salvage Company, Sturgeon Bay, Wisconsin for the construction of additional mooring facilities specified in permit No. 72–56–11 for the sum of $81,300. See Stipulation of Material Facts, paragraph 51, page 12.

3. Purchasing property as described below:

(a) Commencing at the north line of Pearl Street and the West line of Lake Street; thence North along the west line of Lake Street, 135 feet to the southeast corner of the land owned by Stewart; thence north 65° 35′ west along the south line of Stewart's land to Lake Michigan to the north line of Pearl Street; thence east along the north line of Pearl Street to Point of Beginning. Section 9, Town 30 North, Range 12 West, Leelanau County, Leland Township 135 x 250. This property, which covers approximately 0.77 acres and known as the McKay property, is located northerly and adjacent to the existing site and is required to permit development of the access road in the proposed new location and to accommodate the proposed new tile field.

(b) Lots 1, 3, 5, 7, 9, and 11 of Block 5 of the Village of Leland, Section 4, Township 30 North, Range 12 West, Leelanau County, Michigan. This property, consisting of 0.68 acres and comprising the westerly half of Block 5, is bounded on the south, west and north by Pearl, Main and Williams Streets respectively. Its southwest corner is one block from the proposed new entrance to the existing site. This property is required to permit development of the proposed new parking area as described in 2(c) above.

(c) Lots 7, 8, 9, 10, 11 and 12 of Block 1 of the Village of Leland, Section 4, Township 30 North, Range 12 West, Leelanau County, Michigan. This property, consisting of 0.69 acres and comprising the northerly half of Block 1 is bounded on the west, north and east by Lake, Pearl and Main Streets respectively. Its northwest corner is directly across the street from the proposed new entrance to the existing site. This property is required to permit development of the proposed new parking area described in 2(c) above.[5]

It was apparent to the court during the trial that the main thrust of plaintiffs' complaints goes not so much to the additional off-shore mooring facilities called for in permit number 72–56–11 and an increased use of the harbor in consequence, but rather to the heavy increase in use of the harbor and its on-shore environs by small trailer-borne watercraft as a result of the excellent lake trout fishing in the area. Director Wilson testified that the very excellent lakefront fishery has "greatly overtaxed" the on-shore facilities. The testimony at trial established that in prior years lake trout fingerlings were released just below the dam on the Carp River. It was expected that the release of these fingerlings would cause lake trout to be dispersed throughout Lake Michigan, but, in fact, most of the lake trout upon reaching maturity concentrated in the Leland Harbor area. Upon discovery of the abundant supply of lake trout in the area, there was, and still is, a rather frantic overcrowding of fishermen using the harbor for launching and fishing.

The testimony at trial sets forth in great detail the difficulties encountered in the harbor and the community by this substantial increase in fishermen, and by the accompanying increase in small trailer-borne watercraft. The launch facility is over-extended, facilities for the parking of trailers and automobiles are inadequate, picturesque streets and views are obscured by the heavy traffic, trash and litter are proliferated in the area, and the existing toilet facilities are overburdened. It is this condition which so threatens the character of the community and generates the very real concerns of the local residents.

---

5. This list of proposed plans is taken from pages 5 and 6 of plaintiffs' trial exhibit 6, which is entitled "Preliminary Environmental Impact Statement prepared by Waterways Division for Expansion of and Improvement to Leland Harbor Small Craft Facilities".

It is apparent, also, that plaintiffs' concern for the proposed on-shore expansion is that, far from solving the present overcrowding, it will but generate even more use of an already over-taxed area and will cause even greater degradation.

If the issuance of the permit was to be considered as an integral part of the proposed on-shore expansion by the State, a very serious question would be presented as to whether it would have been incumbent upon the district engineer to make additional investigations and file an environmental impact statement. In fact, it was the court's original understanding at the time it issued its preliminary injunction on March 29, 1973 that the proposed actions were all part of one plan. The proofs at the trial disclose, however, that they were not.

From the proofs on trial it develops that at the time application for the permit was made on March 13, 1972 through and including its issuance on June 1, 1972, there were no plans known or which could reasonably have been discovered by the Corps of Engineers relating to any further expansion of the on-shore facilities by the State of Michigan. These plans were not formulated until several months after the issuance of the permit and appear to have been generated by the experience during the summer of 1972 which saw expansion of the use of the on-shore facility by small craft reach nearly epidemic proportions and cause a failure of the sewage facilities provided for public use at the ramp area. The scope of review by a district court of administrative action under the Administrative Procedures Act must necessarily take into account a consideration of what was known or ought reasonably to have been known or foreseen by the district engineer in determining whether his actions in granting the permit were arbitrary or capricious or even unreasonable.

There is no reference whatever to proposed on-shore improvements in the application or in the file of the district engineer leading up to the time of issuance of permit for the simple reason that no such plans existed. Therefore, at the time he considered the project and was obligated to determine whether it was a major federal action significantly affecting the quality of human environment, the district engineer had before him only the proposed addition of the mooring slips applied for, together with the necessary dredging to the depth of six feet and the removal of the dredged material out into Lake Michigan. The notices which he sent out evoked no adverse response whatever even from the plaintiffs who, however, assert that they were lacking in any actual knowledge thereof until April 24, 1972.

It is not indicated that they took any action in opposition between that date and the date of the issuance of the permit on the following June 1. The mooring slips were designed primarily to accommodate larger recreational watercraft cruising the Great Lakes and using the harbor for refuge or temporary occupation. Such boats rarely, if ever, use the launching facility and generate little, if any, automobile and trailer difficulties. The area sought to be dredged was the same as that which had been previously considered and, as the court recalls, authorized in earlier years and the amount of cubic yards to be removed was relatively insignificant. In addition, there was testimony that at the time the original docks were constructed, it had been planned to make further expansion, this being frustrated only by the lack of money at the time. Under the circumstances, therefore, the determination of the district engineer cannot, in the opinion of the court, be found either to have been arbitrary or capricious or unreasonable if such is the standard in this type of case.

For the foregoing reasons, the court finds that for the purposes of determining the responsibilities of the district engineer under the National Environmental Policy Act, the action contemplated under the permit and that which

later was proposed by the State must of necessity be considered as separate projects. It is, therefore, not necessary to decide what would have been the obligation of the district engineer, had, in fact, these two separate projects been but one single and identifiable undertaking in which the issuance of the permit itself related to but a part. Nor is it, absent an acceptance of its pendent jurisdiction, necessary for the court here to determine whether, as to the State of Michigan and as to any obligations owed by its agencies under pertinent state law and regulations, there was a duty to consider the off-shore expansion authorized by the permit with the subsequently proposed on-shore expansion.

## CONCLUSIONS OF LAW

*Jurisdiction*

The court determines that it has jurisdiction of the federal question raised in the case under 28 U.S.C. § 1331(a), that the matter in controversy exceeds $10,000 and that it "arises under the Constitution, laws, or treaties of the United States". The federal laws from which this action arises include the Administrative Procedure Act, 5 U.S.C. § 702; the National Environmental Policy Act, 42 U.S.C. § 4331 et seq.; and the Corps of Engineers authority for granting construction permits for certain structures in harbors, 33 U.S.C. § 403. The complaint in this action presents a claim founded upon federal law. Plaintiffs are seeking to enforce the National Environmental Policy Act by requiring defendant Corps of Engineers to file an environmental impact statement with regard to permit 72–56–11.

*National Environmental Policy Act*

The National Environmental Policy Act of 1969 provides for the preparation and circulation of environmental impact statements when a federal agency is involved in making a recommendation for legislation or when contemplating "major federal actions significantly affecting the quality of the human environment". 42 U.S.C. § 4332(2)(C). On April 23, 1971 the Council on Environmental Quality issued a memorandum in order to provide guidelines to federal agencies for preparing detailed environmental impact statements as required by the National Environmental Policy Act. The memorandum directed federal agencies to implement formal procedures for identifying those agency actions requiring environmental statements.

Pursuant to the memorandum issued by the Council on Environmental Quality, the Army Corps of Engineers published regulations effective January 3, 1972 on the preparation and coordination of environmental statements. 37 FR 2525. Paragraph 5 of the regulations lists agency actions which require the preparation of an environmental statement. Subparagraph g under paragraph 5 states in part as follows:

> g. *Regulatory permits.* Subject to the considerations contained in the specific regulations applicable to the particular activity, issuance of permits for structures, discharges, deposits, or other actions in navigable waters of the United States whenever any of the Federal, State, or local agencies which are authorized to develop and enforce environmental standards certify, and the District Engineer determines, as a matter of record that the proposed action would have a significant and adverse effect on the quality of the environment.

As indicated in the findings of fact, Major Woodall determined that the issuance of a permit to the defendant Department of Natural Resources would not have an adverse effect on the quality of the environment. Therefore, he decided not to issue an environmental impact statement. In reaching this decision, Major Woodall appeared to follow paragraph 11, subparagraph c, of the regulations, which states as follows:

> (c) *Regulatory permits.* In evaluating permit applications, the District Engineer will carefully evaluate the impact on the environment of the pro-

posed action considering environmental information provided by the applicant, all advice received from Federal, State and local agencies, and comments of the public. If the District Engineer believes that granting the permit may be warranted but could lead to significant environmental degradation, an environmental statement will be prepared, except when an "umbrella statement" has been filed with the CEQ (see paragraph 5g above).

### Standard of Review and Holding on Federal Claim

There appears to be a split of authority on the question of the standard of review of an agency's decision not to prepare an environmental impact statement. Some courts review the agency's decision to determine whether it was "arbitrary or capricious", while other courts have applied a test of whether the administrative decision was "reasonable". Compare Hanley v. Kleindienst, 471 F.2d 823, 829 (2nd Cir. 1972) with Save Our Ten Acres v. Kreger, 472 F.2d 463, 465 (5th Cir. 1973).

■ It is not necessary here to decide which standard of review is correct in view of the court's earlier finding that under either standard the actions of Major Woodall were proper. Clearly the National Environmental Policy Act in limiting impact statements to "major" actions does not require the preparation of environmental impact statements for all federal actions. Some actions may be so small or so tenuously related to the environment that the National Environmental Policy Act is not applicable. See Julius v. City of Cedar Rapids, Iowa, 349 F.Supp. 88 (N.D.Iowa 1972); Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.C. Maine); and Kisner v. Butz, 350 F.Supp. 310 (N.D.W.Va. 1972).

■■ It is true that under regulation 11c the preparation of an environ-

mental statement may be required prior to issuance of a permit and the court understands that under proper circumstances this could be necessary even though no federal funds or other action may be involved. C. F. Davis v. Morton, 469 F.2d 593 (10th Cir. 1972). At the same time the court is of the opinion that it is within the discretion vested in the district engineer, and consistent with the interdisciplinary approach of both the National Environmental Policy Act and the Army Corps of Engineers' regulations, to consider such factors as well as all other factors known or which should reasonably have been known to him in forming a belief as to whether granting the permit could lead to significant environmental degradation. See Rucker v. Wills, 358 F.Supp. 425 (E.D. N.C.1973).

### Pendent Claim

Having thus disposed of the federal claim adverse to the plaintiffs here, the question then remains as to whether this court should exercise its pendent jurisdiction to hear the State claims against defendants Michigan Waterways Commission and its director, Keith Wilson and the Michigan Department of Natural Resources. Insofar as their State claims are concerned, the plaintiffs invoke the provisions of the Michigan Environmental Protection Act of 1970, M.C.L.A. § 691.1201 et seq.; M.S. A. § 14.528(201) et seq., as creating standing in them to assert their claim against the State and as support of their assertion that by the passage of that Act, the State of Michigan thereupon waived its sovereign immunity to this suit in this court or in the state courts of Michigan. Plaintiffs more particularly charge the State defendants with failure to comply with Executive Directive 1971–10 issued by the governor of the State of Michigan on September 30, 1971 to all department heads of the state government.[6]

---

**6.** The court recognizes that the plaintiffs also seek relief under 42 U.S.C. § 1983. The plaintiffs, however, have not proved any

such cause of action under Section 1983 and thus, the burden upon them in this regard has not been met.

By the last mentioned directive, Governor William G. Milliken directed that each agency of State government review "all major activities within their jurisdiction to determine their effects on the environment". Briefly stated, the Governor required of department heads that such review should include:

1) The probable impact of the action on the environment;

2) The probable adverse and environmental effects of the action;

3) Evaluation of alternatives to the proposed action; and

4) Possible modifications to the project which would eliminate or minimize adverse environmental effects.

The same directive further ordered the Advisory Council for Environmental Quality to coordinate the state's environmental impact review program and to issue specific instructions and guidelines establishing "which agency activities must be reviewed and the procedures to effectuate the review". The directive further provided that "whenever a federal environmental impact statement is required for a major action under the terms of the National Environmental Protection Act, the agency shall forward a copy of that statement to the Advisory Council for Environmental Quality. The statement may be accepted as fulfilling state requirements under this directive or the Council may direct that additional environmental impact evaluation be undertaken."

In accordance with the mandate of the mandate of the Executive Directive, the Advisory Council for Environmental Quality, on December 19, 1972, adopted guidelines for all state agencies. These guidelines were designed "to assure that all major state activities which affect the environment are carefully scrutinized so changes brought about in land, water, or air use are consistent with the preservation and enhancement of our human and natural environment. A copy of both the Executive Directive and the guidelines is appended hereto for a complete understanding of their particular provisions.

It is the position of the state defendants appearing herein by the Attorney General of Michigan that the governor's directive is but an internal order of the governor's office to all department heads and is only a recitation of policy and, hence, without the force and effect of law. It is the position of the Attorney General that the purpose of the directive is "to provide guidelines to state agencies to assure that all major state activities that affect the the evironment are carefully scrutinized" and that "environmental assessment must be a part of the decision making process of the agency". It is also the position of the Attorney General that the executive department of the State of Michigan may not exercise legislative powers or invade the province of the legislature, but may exercise the delegated powers to determine facts in administrating a particular law. Inferentially therefore, it is the claim of the Attorney General that, to the extent that the Executive Directive is more than a statement of policy and creates any independent cause of action not created by statute, it is violative of Article 4 of Section 22 of the Michigan Constitution of 1963 which provides that "All legislation shall be by bill".

An examination of the Michigan Environmental Protection Act of 1970 as well as an examination of the Executive Directive and guidelines shows an active interest by the legislature and governor of the State of Michigan in acting to preserve and enhance the quality of the human environment within the State of Michigan, independent of any rights or responsibilities created by the federal government. The Michigan statute, the Executive Directive and the guidelines are relatively recent in their origins. To the court's knowledge, no appellate court of Michigan has to this date construed either the Directive or the guidelines, or determine the force and effect which they may have and particularly the critical question of whether they

create in citizens of Michigan an enforceable right of action.

■■ The threshold question in determining pendent jurisdiction is whether the federal claim asserted in the first instance has substance sufficient to confer jurisdiction on the federal court. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court finds here that the federal question asserted by plaintiffs, though decided adversely to them, was nevertheless of sufficient substance to confer subject matter jurisdiction on the court. The extent of the applicability of the National Environmental Protection Act to federal projects is one of some jurisdictional controversy and under the circumstances, it cannot be said that the assertion of the federal right was frivolous or insubstantial. The difficulty here lies in the requirement of Gibbs that "State and federal claims must derive from a common nucleus of operative fact". Gibbs further provides that pendent jurisdiction is essentially a doctrine of discretion and not one of absolute right in the plaintiff:

> Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.[15] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.[16] Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

Ordinarily the court would be reluctant to dismiss the pendent claim where a trial has been had upon the merits, as here. Judicial considerations of economy and convenience normally ought to preclude such decisions after trial. As stated in Gibbs,

> The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

As will be seen by the pleadings in the case, it was alleged by the plaintiffs that the action of the district engineer of the Corps of Engineers was a part and parcel of the overall project to expand the harbor. Because of the urgent need for a resolution of the issues presented, trial was accelerated and advanced upon the court's calendar under Federal Rule of Civil Procedure 65(a)(2) and decision on the motion of the State defendants to dismiss was deferred and was to be decided concurrent

with the accelerated trial so ordered. It was thus not possible for the court to determine in advance what ultimately developed to be the truth: that the federal claim arose quite independently and in advance of the State claim and that the State claim, in fact, constituted the real body of the case to which the federal claim was, if anything, only an appendage. Under the circumstances, therefore, the court is of the opinion that its discretion is most wisely exercised to decline jurisdiction over the pendent State claim. The issues raised by plaintiffs involve vital questions of interpretation of state law and of review of decisions of state administrative agencies under a relatively recent Executive Directive. They involve questions of the relationships between the executive and legislative branches of the State government of Michigan and they involve broad and important questions as to how the State of Michigan will act to achieve the policies inherent not only in the State's Environmental Protection Act, but in the governor's directive.

Accordingly, judgment will enter in favor of defendant Corps of Engineers, vacating the preliminary injunction heretofore entered on March 29, 1973, and dismissing plaintiffs' complaint against the State defendants, but without prejudice.

## APPENDIX

September 30, 1971

### EXECUTIVE DIRECTIVE

### 1971–10

TO: All Department Heads

FROM: Governor William G. Milliken

SUBJECT: Environmental Impact Review

I believe it is the responsibility of State government to lead the way in all aspects of environmental quality protection. Major state activities which effect the environment need to be carefully scrutinized, so that the changes brought about in land, water, or air use are consistent with overall State environmental policy objectives.

I am directing that each agency of State government review all major activities within their jurisdiction to determine their effects on the environment. Such review must include the following:

1. The probable impact of the action on the environment; this includes the impact on human life or other ecological systems such as wildlife, fish and aquatic life; or on air, water, or land resources;

2. Probable adverse environmental effects of the action which cannot be avoided (such as air or water pollution, damage to life systems, urban congestion, threats to health or other adverse effects on human life);

3. Evaluation of alternatives to the proposed action that might avoid some or all of the environmental effects indicated above. This should include a full explanation of the reasons why the agency decided to pursue the action in its contemplated form rather than an alternative course of action;

4. The possible modifications to the project which would eliminate or minimize adverse environmental effects, including a

discussion of the additional costs involved in such modifications.

I further direct that The Advisory Council for Environmental Quality coordinate the State's environmental impact review program. The Council shall issue specific instructions and guidelines within 60 days establishing which agency activities must be reviewed and the procedures to effectuate the review. The Council shall determine which actions should be suspended or modified and will request that the agency take appropriate action in response to the Council's determination. The Council's decision shall be conclusive but subject to my review when deemed appropriate.

The Inter-Departmental Committee on Water and Related Land Resources is directed to screen agency impact statements and forward to the Council for its evaluation those which contain unresolved issues or which concern actions having significant implications for the State's environment. The Committee shall transmit to the Council each month a complete list of impact statements that have been reviewed and the Council may in its discretion direct that any statement not previously forwarded by the Committee, be transmitted for evaluation. Environmental impact statements must be completed by the agency in sufficient time to permit alternative courses of action if necessary in the interest of environmental protection.

The Council will circulate impact statements to other state and local agencies for their review and comments as appropriate. Statements will also be made available on request to private groups or interested citizens. The Advisory Council with the assistance of the agency involved shall provide a forum for public review of any major action if it determines that the public has not had sufficient opportunity to be heard. The Council may grant an emergency exemption from the normal review requirement set forth above if, in its judgment, the public interest would best be served. If an emergency should occur, the agency shall contact the Council which will immediately consider and determine the request for exemption.

Whenever a federal environmental impact statement is required for a major action under the terms of the National Environmental Protection Act, the agency shall forward a copy of that statement to the Advisory Council for Environmental Quality. The statement may be accepted as fulfilling state requirements under this Directive or the Council may direct that additional environmental impact evaluation be undertaken.

I intend to see that an efficient process is developed to provide environmental assessment without delaying the work of state agencies. Therefore, I am instructing the Council to require agencies to submit only that material which will be necessary to determine the specific environmental impacts of major actions.

 (s) William G. Milliken

GUIDELINES FOR IMPLEMENTING STATE OF MICHIGAN

EXECUTIVE DIRECTIVE 1971–10

prepared by

The Advisory Council for Environmental Quality
Adopted: December 19, 1972

Par. 1. Purpose
 2. Authority
 3. Policy
 4. Definitions
 5. Application
 6. Procedures
 7. Contents and Format
 8. Review Process

 Appendix A—Text of Executive Directive 1971–10
 Appendix B—Sample title sheet

1. *Purpose*

To provide guidelines to state agencies to assure that all major state activities which affect the environment are carefully scrutinized so that changes brought about in land, water, or air use are consistent with the preservation and enhancement of our human and natural environment.

2. *Authority*

Executive Directive 1971–10

3. *Policy*

Implementation of Executive Directive 1971–10 should be based on the philosophy that all actions of State government that are major in scope or would have a significant impact on the environment should be the subject of a formal environmental assessment and that the results of the assessment should be reported on with either a full environmental impact statement or a declaration of no significant negative impact.

Based on the premise that environmental protection will be best served when all decisions are made from an environmental perspective, it is the intent of Executive Directive 1971–10 that environmental assessment must be a part of the decision-making process in each agency.

Maximum use of public involvement procedures and public hearings is encouraged as part of the decision-making process. Where appropriate the environmental impact statement should be available prior to public hearings. A mechanism to inform the public of the availability of environmental impact statements should be developed by all agencies.

4. *Definitions*

 A. Major State Action—Any policy, administrative action, or construction project proposed by an agency of the State of Michigan which would result in any of the following:

 (1) A potential significant negative impact on the human environment that would adversely affect the public health and welfare or would degrade the quality of life.

(2) The permanent alteration or destruction of a significant element of the human, natural, or historic resources of the State.

(3) The significant alteration of existing land use patterns.

(4) The significant alteration of population distribution or which would lead to potential distribution changes.

(5) The significant impact on the maintenance and enhancement of the long-term productivity of the State's natural resources.

(6) The imposition of an alteration to the ecological balance of a significant element of the environment.

B. Significant—Having a special meaning or impact with regard to any part of the human or natural resources of the State. Significant characterizes the scale of an action either in the size or importance of an element of the environment with regard to maintaining the structural integrity and the behavioral stability of the element. Significant should be considered to be synonymous with such terms as unique, large scale, extensive area, high volume. Particularly the determination of significant should relate the size of the influence to the size of the element impacted.

C. Element—A portion or component of the natural or human resource complex of the State which can be identified, either because of its nature, size, location or value as potentially being altered by a proposed action.

Environmental elements are identified in three categories: biological, physical, chemical, and include such things as watersheds, water bodies (all or in part), forest, recreation, or habitat areas, environmental zones (shore lands, etc.) or any other definable location, space, mass, or resource complex that would be directly or indirectly impacted by a proposed action.

Human elements are identified in two categories: social and economic, including public health, demographic factors, communities, neighborhoods, and economic gains and losses that would be directly or indirectly caused by a proposed action.

D. Impact—Any alteration or change in some element of the human or natural environment. Determination of change would be based on an evaluation of the existing state of the environmental element in question. The element of the human or natural environment could be any of three categories: biological; including such sub-categories as human, animal, plant, and aquatic; physical and chemical, which would include factors associated with impacts on water, air, and land; and social, including impacts on community as well as individuals.

E. General public concern or controversy—The public expression of dissatisfaction or discontent with a proposed action to the extent that the responsible agency can determine that sufficient question exists concerning the environmental effects of the action to merit an indepth environmental assessment. The determination must be based on the evaluation that the question of a genuine public interest exists.

F. Negative Statement—A declaration of no significant environmental impact, which can, in some cases, be submitted in lieu of an environmental impact statement. The negative statement can be utilized where a major action is proposed which would require an impact statement under these guidelines, but where it can be reasonably determined that the action will not have a significant adverse impact on the environment. Negative statements are only applicable for projects of sufficient scale or impact as to be considered a major State action, as defined in these guidelines.

5. *Application*

A. An environmental impact statement shall be prepared and processed in accordance with these guidelines for all major State actions including:

(1) *Policy*

Any policy or procedure that sets a definite course or method of action that will result in a definable impact on any environmental element. Included would be actions that result in any permanent alteration or destruction of the State's resources, that would significantly alter existing land use patterns, distribution of population, would result in alteration of the maintenance and enhancement of the long-term productivity of the State's natural resources, or would propose to change the management of a resource.

(2) *Administrative Actions*

Administrative actions taken by State agencies including the issuance of permits, authorizations for the discharge or use of materials that would result in a degradation of environmental quality, (particularly in concentrations that could prove toxic to human, aquatic or animal life) the approval of projects requiring land acquisition or construction that will utilize State funds including grants in aid, and the authorization of the change in land utilization through exchange or use permits, or changes in administrative practices that would alter the management of our natural resource base and/or the relationships of portions of the base.

(3) *Construction Projects*

For construction projects that are financed totally or in part with State funds.

B. Environmental Impact Statements will be prepared for any major State action that is the center of general public concern or controversy.

C. Environmental Impact Statements will be prepared for any major State action when requested by the Governor or by the Governor's Advisory Council for Environmental Quality.

6. *Procedures*

A. Environmental Impact Statements will be prepared at a time when they can be utilized during the normal decision-making

process of the agency charged with the responsibility of taking the subject action. In all cases impact statements should be completed in sufficient time to permit alternative courses of action if necessary in the interest of environmental protection.

B. In each case where a major action, within the intent of these guidelines, is proposed the responsible agency will determine the potential impacts that would normally result from such an action and identify the environmental element(s) that would be impacted by the action.

Each major State action should be reviewed by the proposing agency in light of a three-fold test:

(1) Is the proposed action of such a scale that because of its size alone it would result in a significant impact on the human or natural environment?

(2) Would it, regardless of its size, result in a significant impact on an important or unique element of the human or natural environment?

(3) Will it generate a general public concern or controversy?

C. Based on the predicted impacts of the proposed action, the determination of the size and character of the element(s) being impacted and the three-fold test the agency will prepare either:

a. An environmental impact statement.

b. A declaration of no significant negative impact (negative statement).

D. *Categories of Major Action*—Major actions, as set forth in Section 4. Definitions can be separated into two categories: Individual and Continuing Actions.

(1) *Individual Actions*

Those actions of an agency that are proposed and implemented as activities that are separate and distinct from other actions conducted by the agency, but including all individual actions of the same type that are planned, funded, or carried out as individual projects. (i. e. highway projects could be considered a class of activity but each project is planned, designed, and funded as an individual action and has specific impacts to different elements of the environment.) When environmental assessments are made during the planning phase for a major program such as the development of a park, which is to be implemented in stages, one impact statement or negative declaration should be prepared for the entire project as an individual action. Supplemental statements will then be required only when substantial changes are made to the original plan.

(2) *Continuing Actions*

Those actions of a State agency that represent an activity that is major in character or has a significant impact on the environment but are also of a continuing or repetitious

character may be evaluated as a class of actions. This category would include annual programs including but not limited to such activities as stocking of fish or game (with the exception of new species), the application of herbicides or pesticides (with the exception of major new programs or materials), management of portions of a resource (unless a major change in practice is proposed), etc. Once an impact statement is submitted on a class of continuing actions, actions within that class will not require an impact statement unless:

(a) The project's impact is essentially different in character or scale than for the action previously reviewed.

(b) The environmental element impacted is of unique character or importance.

(c) The proposed action is the object of general public concern or controversy.

Should any of the above three factors apply an impact statement will be required.

E. Each agency will establish subject to the approval of the Council a procedure to notify the public of the availability of impact statements and to provide for their review by interested groups and individuals a reasonable period of time before the contemplated action is undertaken.

F. Occasionally State agencies will be confronted with emergency situations requiring immediate action. In these cases, relief from the provisions of Executive Directive 1971–10 can be obtained from the Council if in its judgment the public interest would best be served.

In emergency situations the responsible agency shall contact the Executive Secretary of the Advisory Council who shall poll the Council membership or call a special meeting. In critical emergencies, it is understood that agency heads may need to contact the Governor directly and defer the normal procedure outlined in this section, and take action as the Governor may determine.

A complete report of the situation including an environmental impact statement, will be made to the Advisory Council at a subsequent meeting.

G. In all cases where an impact statement is required in compliance with the National Environmental Policy Act of 1969, that statement may be used for review in lieu of a statement required by these guidelines.

7. *Contents and Format*

A. Environmental Impact Statements will have a title page similar to the example in Appendix B.

B. The following provisions, as a minimum, are to be covered in environmental statements.

(1) A description of the proposed action, the environmental element that will be affected, an expression of the public in-

terests, the authority under which action is to be taken, and, where appropriate, a discussion of the economic gains and losses including the effect on employment, income levels, property values, taxes, and the cost of alternatives to the proposed action.

(2) The probable impact of the action on the environment; this includes the impact on human life or other ecological systems such as wildlife, fish and aquatic life; or on air, water, or land resources;

(3) Probable adverse environmental effects of the action which cannot be avoided (such as air or water pollution, damage to life systems, urban congestion, threats to health or other adverse effects on human life);

(4) Evaluation of alternatives to the proposed action that might avoid some or all of the environmental effects indicated above. This should include a full explanation of the reasons why the agency decided to pursue the action in its contemplated form rather than an alternative course of action.

C. The following graphic displays as a minimum are to be provided as part of an impact statement.

(1) A map that shows the location of the proposed action. (If applicable) with respect to communities or features that are readily identifiable as locations in the State.

(2) A map or diagram that illustrates the relationship of the physical parts of the action to the environmental element(s) being impacted, for example a proposed ore extraction and processing operation would require a site map showing the location of the ore body, the processing plant, the waste rock and tailings disposal areas and their relationship to the element(s) of the environment being impacted.

8. *Review Process*

A. Upon completion, the environmental impact statement shall be forwarded to the Inter-Departmental Committee on Water and Related Land Resources. Fifteen (15) copies of the statement will be required for review. In cases where the prescribed number of copies represents an unreasonable expense or is not practical, relief from this requirement may be obtained from the Secretary of Inter-Comm. Transmittal of fewer copies may result in delays in the review process.

Where necessary one complete set of maps, profiles, charts, and displays may be provided to the Secretary of Inter-Comm along with a summary of the data which would be attached to the impact statement. In this case it will still be necessary to include the required graphics in the statement.

B. Inter-Comm will circulate the impact statement among its membership for review.

C. Within forty (40) days Inter-Comm will acknowledge review or will return the statement with any unresolved questions

to the originating agency. Upon resolution of the problem areas the review process will be completed. (Where shorter review time is required, this situation should be so stated on the statement.)

D. In the case that problem resolution cannot be reached, the statement and a report on the problem will be forwarded to the Advisory Council.

E. Environmental impact statements having significant implications to the State's environment will be forwarded to the Advisory Council.

F. At each monthly Advisory Council meeting, Inter-Comm will provide in writing a brief description of each statement, including negative impact statements, reviewed and its disposition.

G. Review procedures under these guidelines shall be coordinated with the State Clearinghouse.

H. Where not restrained by statute agencies preparing statements shall allow a period of not less than 30 days for public response after the environmental impact statement becomes available before a decision is made on the proposed action.