The **HOUSATONIC RIVER**, Judith Davidson, and Karan Spirer, Plaintiffs,

v.

**GENERAL ELECTRIC COMPANY**, Defendant.

Civ. No. B–77–314.

United States District Court, D. Connecticut.

Dec. 4, 1978.

Alan R. Spirer, Davidson & Spirer, Westport, Conn., for plaintiff.

William R. Murphy, Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for defendant.

## RULING ON MOTION TO DISMISS

DALY, District Judge.

The Housatonic River is a navigable waterway which flows southward across Connecticut and empties into Long Island Sound. The river originates in Massachusetts, where the defendant in this diversity action, General Electric Company, allegedly has deposited into its waters a toxic and durable chemical known as polychlorinated biphenyls (PCB). Plaintiffs Davidson and Spirer have brought this action under the citizen-suit provision of the Connecticut Environmental Protection Act of 1971 (CEPA), Conn.Gen.Stat. § 22a–16,[1] under a similar standing provision in the Connecticut Inland Wetlands and Water Courses Act (IWWCA), Conn.Gen.Stat. § 22a–44,[2] and

---

[1]. Conn.Gen.Stat. § 22a–16 (1977) provides in relevant part:

The attorney general, any political subdivision of the state, any instrumentality or agency of the state or a political subdivision thereof, any person, partnership, corporation, association, organization, or other legal entity may maintain an action in the superior court . . . for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction.

[2]. Conn.Gen.Stat. § 22a–44 (1977) provides in relevant part:

The superior court in an action brought by the commissioner [of Environmental Protection], municipality, district or any person shall have jurisdiction to restrain a continuing violation of said sections and to issue orders that the violation be corrected or removed. . . .

There is little reason to accept a less than literal interpretation of the "any person" standing provision. The Connecticut Supreme Court has not had an occasion to interpret the provision, and the legislative history does not include even a single reference to that portion of the statute. *See* Connecticut General Assembly 1972, Senate proceedings, Vol. 15, pt. 4, at 1782–91 (April 13, 1972); House Proceedings, Vol. 15, pt. 4, at 1607–30 (April 10, 1972); Hearings before the Joint Standing Committee on the Environment at 1–34B (Jan. 11, 1972). During the debate on a successful amendment to § 22a–44 concerning the recovery of attorneys fees, the grant of standing to "any person" to restrain a violation of IWWCA was mentioned without any suggestion that some form of particular adverse interest was required. *Connecticut General Assembly 1976*, House Proceedings, Vol. 19, pt. 5, at 1891 (April 13, 1976) (remarks of Rep. McCloskey). The amendment passed the State Senate without debate. Senate Proceedings, Vol. 18, pt. 5, at 2230 (April 29, 1976).

under state common law,[3] alleging that the discharge of the PCB has "created a health hazard and an environmental threat to the Housatonic River, Long Island Sound and thus to the people of the State of Connecticut, salt and freshwater aquatic life, birds, mammals and plants."

The plaintiffs rely heavily on the citizen-suit provisions in CEPA and IWWCA. They have made no attempt to differentiate their interests from those of the general public. They have not alleged any personal stake in the outcome of the suit except that deriving from their status as citizens and property owners of Connecticut, and as residents of Wilton and Westport, Connecticut.[4] Neither town borders on the Housatonic River, and the plaintiffs have not alleged that they use the river or its environs for any particular form of recreation.

## I.

In passing CEPA, the Connecticut legislature meant to reinforce the administrative resources devoted to environmental protection by enlisting the aid of concerned citizenry. In providing "any person" with the right to sue to protect the public trust, "the legislature expanded the number of potential guardians of the public interest in the environment into the millions, instead of relying exclusively on the limited resources of a particular agency." *Greenwich v. Connecticut Transportation Auth.,* 166 Conn. 337, 343, 348 A.2d 596, 599 (1974). Section 22a–16 established a cause of action against unreasonable pollution that could be brought by any citizen, thus rejecting the traditional requirement that the plaintiff show a personal or unique injury separate from that suffered by the public at large.[5]

---

3. Although the Act does not refer explicitly to a "public trust", § 22a–36 of the Act does state that the

> inland wetlands and water courses of the state of Connecticut are an indispensible and irreplaceable but fragile natural resource with which the citizens of the state have been endowed. . . . The preservation and protection of the wetlands and water courses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state.

3. This suit was originally filed in Connecticut Superior Court, but was subsequently removed by the defendant on the basis of diversity of citizenship under 28 U.S.C. §§ 1441, 1446. Following oral argument on the motion, the Court dismissed from the bench the named plaintiff Housatonic River. The count alleging trespass was dismissed for failure to allege interference with a possessory right. *See Chapel-High Corp. v. Cavallaro,* 141 Conn. 407, 410–11, 106 A.2d 720 (1954). The count in private nuisance was dismissed because the plaintiffs had not alleged any injury to a right derived from their ownership in land, *see Webel v. Yale University,* 125 Conn. 515, 525, 7 A.2d 215 (1939), and the claim of public nuisance suffered a similar fate because the plaintiffs had not alleged a special injury separate from that suffered by the public at large. *See Truesdale v. Town of Greenwich,* 116 Conn. 426, 165 A. 201 (1933). In addition, the legislative history makes clear that the General Assembly did not intend to alter the common law of nuisance. *See* Connecticut General Assembly 1971, House Proceedings, Vol. 14, pt. 2 at 738 (March 21, 1971)

(remarks of Rep. Papandrea). Finally, the negligence claim based on the theory of negligence *per se* resulting from the violation of a statutory duty was also dismissed for failure to allege a direct, personal injury. This ruling is consistent with the intent of the legislature not to expand in any way the power of the courts to award money damages. *See Id.* at 739.

4. The complaint also alleges that the plaintiffs are voters. However, this fact is unnecessary to the asserted statutory basis for standing.

5. *See, e. g., Beckish v. Manafort,* 40 Conn.L.J. No. 3, at 1, 3 (Sup.Ct. July 18, 1978): *New Haven v. Public Utilities Comm'n,* 165 Conn. 687, 700–703, 345 A.2d 563 (1974); *Bassett v. Desmond,* 140 Conn. 426, 430–32, 101 A.2d 294 (1953); *Waterbury Trust Co. v. Porter,* 130 Conn. 494, 498, 35 A.2d 837 (1944).

In the State Senate, one supporter of the bill explained that "[o]nly imaginative legal relief, legal actions on behalf of the general public in class action suits for declaratory judgment and injunctive relief will get this story told." Connecticut General Assembly 1971, Senate Proceedings, Vol. 14, pt. 3 at 1092–93 (April 15, 1971) (remarks of Sen. Pak). Representative Ajello explained to the other members of the Connecticut House of Representatives that "our purpose . . . is to have the ordinary citizens of the State of Connecticut be able to . . . [take] action where it seems that no one else will or can." Connecticut General Assembly 1971, House Proceedings, Vol. 14, pt. 2 at 756 (March 21, 1971).

The existing legal barrier to such suits was characterized by another House member as the

5

The Connecticut Supreme Court has not ruled explicitly on the validity of the statutory grant of standing under CEPA and it apparently has never been faced with a question involving the IWWCA citizen standing provision.[6] On two occasions, the court referred to the CEPA citizen-suit provision without any suggestion that the court might narrow the statute's broad sweep in a later suit. *Belford v. City of New Haven*, 170 Conn. 46, 53–55, 364 A.2d 194 (1975); *Greenwich v. Connecticut Transportation Auth., supra.* In those two cases, however, the court found CEPA inapplicable to the situations presented and so did not directly confront the standing issue presented here. Also of significance is the recent decision of *Mystic Marinelife Aquarium, Inc. v. Gill*, 40 Conn.L.J. No. 5, at 24 (Sup.Ct. Aug. 1, 1978). In that case, the state Supreme Court determined that the plaintiff had not met the standard aggrievement criteria for appeals from administrative decisions, including the requirement of a "specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as in the concern of all members of the community as a whole." *Id.* at 27, *quoting Nader v. Altermatt*, 166 Conn. 43, 51, 347 A.2d 89, 94 (1974). The court also referred to the oft-repeated "fundamental concept of judicial administration that no person is entitled to set the machinery of the courts in operation except to obtain redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or a representative capacity." *Id.* at 28, *quoting Waterbury Trust Co. v. Porter*, 130 Conn. 494, 498, 35 A.2d 837 (1944).[7] The court did affirm the lower court's conclusion that the defendant's plan would not unreasonably impair the public trust in the Mystic River, but did so without explicitly determining the validity of the broad grant of standing under

---

need to show "a personal direct ownership or other interests in the land which [a plaintiff] claims as being affected by the alleged activity." "Consequently", the speaker explained, "some of the most beautiful aspects of our environment . . . are such that they do not lend themselves to a proprietary or a personal interest and this bill makes the preservation and the protection of those rights available to the general public which they are not presently under our law." *Id.* at 741 (remarks of Rep. Papandrea). *See* Connecticut General Assembly 1971, House Proceedings, Vol. 14, pt. 2, at 733–765; Senate Proceedings, pt. 3, at 1082–97 (April 15, 1971); Proceedings of the Joint Standing Committee on the Environment, at 161–2, 221–224 (February 19, 1971), (testimony of Messrs. Wade, Taubman, and Moore). *See generally*, Kelly, *Belford v. City of New Haven: Erosion of the Private Plaintiff's Standing under the Environmental Protection Act*, 50 Conn. B.J. 411, 412 (1976).

Criticism of the citizen-suit provision focused primarily on the possibility of harassment, publicity-seeking, and frivolous suits. *See* Connecticut General Assembly 1971, House Proceedings, Vol. 14, pt. 2, at 747–50, 763–64 (March 21, 1971) (remarks of Rep. King). In order to protect the public from the res judicata effects of a suit brought by a "weak or incompetent plaintiff," one legislator proposed an amendment making the state Attorney General a necessary party to every citizen suit. *See id.* at 753–754 (remarks of Rep. Camp). This proposal was rejected following a brief debate in which the consensus appeared to be that res judicata would not apply to suits brought to prevent continuing pollution. *See id.* at 757 (remarks of Rep. Sullivan).

6. Lower Connecticut courts have accepted the CEPA statutory standing provision without much controversy. *See Manchester Environmental Coalition v. Stockton*, Docket No. 209931 (Conn.Super.Ct., Htfd. Cty., Dec. 5, 1977), Connecticut Law Tribune, Vol. 3, No. 51, p. 15 col. 4 & p. 15 col. 1 (Dec. 19, 1977); *Housatonic Valley Ass'n v. Burns*, Docket No. 189812 (Conn.Super.Ct., Htfd. Cty., Sept. 25, 1975), Connecticut Law Tribune, Vol. 3, No. 35, p. 16 col. 1 (Aug. 29, 1977).

7. The Connecticut Constitution has no case or controversy provision similar to Article III, § 2 of the U.S. Constitution. The state constitution, however, does include a separation of powers provision. Conn.Const., Art. 2. *See State v. Clemente*, 166 Conn. 501, 512 (1974); *State ex rel. Kelman v. Schaffer*, 161 Conn. 522, 290 A.2d 327 (1971); *Adams v. Rubinow*, 157 Conn. 150, 158–59, 251 A.2d 49 (1968); *Norwalk Street Railway Company's Appeal*, 69 Conn. 576, 593, 602–603, 37 A. 1080, 38 A. 708 (1897); Kay, *Separation of Powers and the Rule Making Authority in Connecticut*, 8 Conn. L.Rev. 1 (1975). The Connecticut Constitution also includes the guarantee of a right to a remedy for any injury to person, property or reputation. Conn.Const. Art. I, § 10. *See Gentile v. Altermatt*, 169 Conn. 267, 363 A.2d 1 (1975), noted in 8 Conn.L.Rev. 753 (1976).

CEPA. This Court, then, finds itself without authoritative guidance from the Connecticut Supreme Court on the issue of the standing of the present plaintiffs under either IWWCA or CEPA.

## II.

■ This Court feels compelled by the recent decision in . *Naylor v. Case & McGrath, Inc.*, 585 F.2d 557 (2d Cir. 1978), to invoke the doctrine of abstention and to refrain from deciding this matter. This case turns, at least initially, on the resolution of the difficult question of whether these plaintiffs should be given standing under relatively recent Connecticut statutes. The resolution of this issue could have a fundamental effect on an important area of state policy. The question is one of which there has been no authoritative decision by the Connecticut Supreme Court, and one which is susceptible to an interpretation that would obviate the necessity for a determination by this court of the applicability to this diversity action of the Article III "case or controversy" requirement.[8] *See Naylor v. Case & McGrath, Inc., supra* at 565, *quoting Railroad Commission v. Pull-*

man*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

In *Naylor,* the court noted that abstention was proper in that the "state has provided a unified method for the formation of policy and determination of issues by the Commissioner of Consumer Protection and in the state courts." *Id.* at 565, *citing Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The same consideration here indicates that abstention is appropriate.

Connecticut has established a Department of Environmental Protection, C.G.S. § 22a–2, and has given the Commissioner of Environmental Protection broad authority to carry out the environmental policies of the state. C.G.S. § 22a–5. The Commissioner is empowered to adopt environmental standards, to hold hearings concerning violations, and to enter appropriate orders. C.G.S. § 22a–6. The Commissioner is also authorized, within certain limitations, to adopt a schedule of civil penalties for violations of applicable laws, regulations, and orders, C.G.S. § 22a–6b, and to formulate a statewide environmental plan. C.G.S. § 22a–8. Also established is a Council on

---

**8.** This suit is what has been termed a "public action," meaning an action brought on behalf of the public interest by someone without a "distinct and palpable injury to himself." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The first two counts in the complaint make clear that the plaintiffs intend to rely solely on the state statutory grants of standing. They have made no claims of direct, personal injury. If the statutory grant of standing were determined to be valid, this Court would confront in the context of diversity jurisdiction the "fundamental question of whether public actions are an appropriate matter for federal courts." *United States v. Richardson*, 418 U.S. 166, 187 n.6, 94 S.Ct. 2940, 2951, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). The recent Supreme Court debate as to the justiciability of a legislatively created "public action" consists of a series of cryptic comments often found in footnotes to the court's opinions or in occasional concurrences and dissents. *See Singleton v. Wulff,* 428 U.S. 106, 124–25 n.3, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41 & n.22, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *id.* at 58–59, 64, 96 S.Ct. 1917 (Brennan, J. concurring); *Warth v. Seldin, supra* at 500–01, 514, 95 S.Ct.

2197; *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 224 n.14, 227 n.16, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson, supra* at 194 n.15, 196 n.18, 94 S.Ct. 2940 (Powell J. concurring); *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J. concurring); *Sierra Club v. Morton*, 405 U.S. 727, 732 & n.3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Barlow v. Collins*, 397 U.S. 159, 172–73 n.6, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan J., concurring); *Association of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 153 n.1, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Flast v. Cohen*, 392 U.S. 83, 116–133, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting). Although the earlier comments are somewhat ambiguous, the Supreme Court's position now appears to be that although the legislature can establish new categories of personal interest deserving of court protection, the legislature has no authority to grant standing to a party who has no "personal stake" in the resolution of the question. *See e. g., Singleton v. Wulff, supra; Simon v. Eastern Ky. Welfare Rights Org., supra.*

Environmental Quality, C.G.S. § 22a–11, which is "empowered to receive and investigate citizen complaints alleging violation of any statute or regulation in respect to environmental quality," and to refer the complaint to the appropriate regulatory agency or to the Commissioner, as it deems appropriate. C.G.S. § 22a–13.

Under IWWCA, the Commissioner is directed to, among other things, inventory the state's wetlands and watercourses; encourage, participate in, or conduct studies; retain and employ consultants and assistants; and promulgate such regulations as are necessary to protect the wetlands or watercourses. C.G.S. § 22a–39. Municipal participation is encouraged through the provision that:

> Any municipality . . . may authorize any board or commission, . . . or may establish a new board or commission to promulgate such regulations, in conformity with the regulations promulgated by the commissioner [of Environmental Protection], as are necessary to protect the wetlands and watercourses within its territorial limits.

C.G.S. § 22a–42(c).[9]

■ As these provisions indicate, the state has established a relatively comprehensive administrative structure for the purpose of developing and effectuating the state's environmental protection policies. Further, the state has provided a means by which its courts, when presented with allegations of environmental violations, can utilize the expertise of the appropriate administrative bodies.[10] Thus, the citizen standing provisions in CEPA and IWWCA may be viewed as but one aspect of a "unified method for the formation of policy and the determination of issues by the Commissioner . . . and in the state courts." *Naylor v. Case & McGrath, Inc., supra* at 565. In this context, it is proper for the federal court to defer to the expertise of the state court and regulatory agencies. This will "increase the assurance that all those affected by the statute in question, including the parties to this action, will be given the benefit of an authoritative and uniform rule of law . . . ." *Id.*

Abstention is particularly appropriate under this rationale in that other questions of first impression under CEPA and IWWCA will possibly arise in this action that are appropriate for initial determination in the state courts. *See Id.* at 563–64. Particularly significant in this case is the question of whether CEPA and IWWCA. are applicable to extraterritorial activities.[11]

---

9. Municipalities are also authorized to join together in the formation of a district for the regulation of activities affecting the wetlands and watercourses within such district. C.G.S. § 22a–42(d). Section 22a–42(f) provides that, if a municipality has not exercised its regulatory authority, the commissioner shall take such action as is necessary to protect that municipality's wetlands and watercourses.

10. Section 22a–18(b) provides, in part:

> If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, the court in its discretion may remand the parties to such proceedings.

It is significant that no standards are set forth in CEPA for determining when challenged pollution rises to the level of unreasonableness. It is the apparent intent of the legislature, manifest in the above statutory provision, that such standards be developed through active interchange among the courts, the commissioner, and appropriate administrative agencies.

11. The activity alleged here to be in violation of CEPA and IWWCA is taking place in Massa-chusetts. This raises a number of interesting and difficult questions of state law. Is CEPA applicable to conduct beyond the state's borders? This question is particularly significant in that extraterritorial conduct probably has a significant effect on the quality of Connecticut's atmosphere.

As noted in the text, the framers of IWWCA envisioned a scheme of municipal or district regulation of wetlands or watercourses within each municipality or district, with regulation by the Commissioner of Environmental Protection in the event of inaction by any particular municipality. Are municipalities authorized under IWWCA to regulate conduct outside of the state or even outside of their own municipalities? Is the defendant in this case required to comply with the regulations of each municipality or district bordering on the Housatonic? Does § 22a–44 authorize citizens of one municipality to bring an action to enforce the regulations of another municipality? All of the above questions are appropriate for determination in the first instance by the state courts.

"In the unique situation of the present case abstention can be exercised through remand, assuring an adjudication of the state law issues in the pending action without risk of delay. That is the indicated course where, as here, the state law is uncertain and its resolution is a matter of concern to the state." *Id.* at 565.

For the reasons stated above, Counts One and Two of this case, the remaining counts previously having been dismissed, should be remanded pursuant to 28 U.S.C. § 1447(c). *See Armstrong v. Armstrong*, 508 F.2d 348, 350 (1st Cir. 1974).

IT IS SO ORDERED.