**MINNESOTA PUBLIC INTEREST RESEARCH GROUP, a Minnesota non-profit corporation; Dakota County Environmental Protective Association, a Minnesota non-profit corporation; and the City of Sunfish Lake; and the State of Minnesota by the Minnesota Public Interest Research Group; the State of Minnesota by the Dakota County Environmental Protective Association; and the State of Minnesota by the City of Sunfish Lake, Plaintiffs,**

**v.**

**Brock ADAMS, Secretary of Transportation; Donald E. Trull, Regional Federal Highway Administration, Department of Transportation; E. Dean Carlson, Federal Division Engineer, Federal Highway Administration, Department of Transportation; Richard Braun, Commissioner, Department of Transportation, State of Minnesota; Merritt Linzie, District Engineer, District 9, Department of Transportation, State of Minnesota; and each and every one of the foregoing individually as well as in his designated official capacity; and the Minnesota Department of Transportation, Defendants.**

No. Civ. 4–73–461.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 7, 1979.

---

Phillip W. Getts, Dayton, Herman, Graham & Getts, Minneapolis, Minn., for plaintiffs Minnesota Public Interest Research Group and Dakota County Environmental Protective Ass'n.

Richard E. Leonard, City Atty., St. Paul, Minn., for plaintiff-intervenor City of Sunfish Lake.

Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., for defendants Brock Adams, Donald E. Trull and E. Dean Carlson, William A. Caldwell, Sp. Asst. Atty. Gen., and Eric B. Schultz, Sp. Counsel, St. Paul, Minn., for defendants Richard Braun, Merritt Linzie and Minnesota Dept. of Transp.

MacLAUGHLIN, District Judge.

This matter is before the Court on the motion of plaintiffs, the Minnesota Public Interest Research Group [hereinafter MPIRG], the Dakota County Environmental Protective Association [hereinafter DCEPA], and plaintiff-intervenor the City of Sunfish Lake, for a preliminary injunction which seeks to enjoin the defendants from proceeding with the construction of the final 11 miles of Interstate 494, a part of the interstate highway beltline route which encircles the Twin Cities metropolitan area. In 1974, the plaintiffs and the state and federal defendants entered into a stipulation whereby defendants agreed to refrain from proceeding in the construction or development of Interstate 494 in order to prepare an environmental impact statement in accordance with Section 102 of the National Environmental Policy Act (NEPA). 42 U.S.C. § 4332. A final environmental impact statement (FEIS) has been prepared and approved by the defendants, and as no expiration date was specified in the 1974 stipulation of the parties, plaintiffs have made the present motion for a preliminary injunction to halt construction. Plaintiffs' principal contentions with respect to their motion for a preliminary injunction are that the FEIS is both procedurally and substantively inadequate under NEPA, and that the proposed construction violates the provisions of the Minnesota Environmental Policy Act (MEPA), Minn.Stat. Ch. 116D, and the Minnesota Environmental Rights Act (MERA), Minn.Stat. Ch. 116B. At the hearing on plaintiffs' motion, the Court orally denied plaintiffs' request for a preliminary injunction. The Court, having considered the entire record, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court has jurisdiction of this controversy under 28 U.S.C. § 1331, 28 U.S.C. § 1346 and 5 U.S.C. § 701.

*THE PARTIES*

MPIRG is a Minnesota non-profit corporation supported by contributions from student members attending various colleges and universities in Minnesota and is involved in various public interest issues, including environmental protection. DCEPA is also a Minnesota non-profit corporation

whose members reside in Dakota County, and this organization is likewise engaged in efforts to preserve the environment. The City of Sunfish Lake is a small residential city located in northern Dakota County along the proposed route of Interstate 494.

The individual defendants are various officials of the federal and state agencies [the federal defendants and the state defendants] responsible for the Interstate 494 construction proposal. The Minnesota Department of Transportation [hereinafter MDOT] is also named as a defendant.

## THE PROPOSED ACTION

The proposed interstate highway construction advocated by the defendants involves the building of a six lane interstate highway beginning near 24th Avenue in Bloomington and extending eastward across the Minnesota River and Dakota County to the Mississippi River Bridge directly east of South Saint Paul. The proposed construction would complete the southern component of the Interstate 494 beltline which surrounds the Twin Cities metropolitan area. The proposed highway will run in an east-west direction and contemplates the construction of a bridge across the Minnesota River. Thus, the beginning point and terminus with respect to the present proposal were predetermined, as the interstate highway has previously been constructed west of 24th Avenue in Bloomington and east of the Mississippi River Bridge. The present proposal involves approximately 11 miles of highway construction. Prior to the actual construction, the federal and state defendants must obtain a number of permits from both federal and state agencies.

Dakota County encompasses an area located directly south of the City of St. Paul, east of Bloomington and southeast of Minneapolis, and is bounded on the north, east and west by the Minnesota and Mississippi Rivers. The northern portion of Dakota County includes the communities of West St. Paul, South St. Paul, Mendota Heights, Eagan, Sunfish Lake, Mendota, and Inver Grove Heights. While commercial and industrial development and the population of Dakota County has continually increased, it

has also retained a certain rural character. The major east-west thoroughfare in northern Dakota County is T.H. (Trunk Highway) 110 which intersects with T.H. 13 in the western portion of Dakota County, and eventually intersects with T.H. 55, T.H. 49 (Dodd Road), T.H. 52 (Robert Street), and T.H. 3. T.H. 55 runs generally in a northwest-southeast direction. Interstate 35E, in various stages of construction, is eventually planned by defendants to run in a north-south direction through western Dakota County. The Mendota Bridge crosses the Minnesota River near Mendota, and three highways—T.H.'s 3, 110 and 55—all intersect in a confined area southeast of this bridge in Dakota County. According to the FEIS, this intersection has currently reached its theoretical traffic capacity. The FEIS indicates that the automobile accident rate at this intersection is consistently among the highest in the eastern section of the Twin Cities metropolitan area.

The alternate selected, alternate B3, was one of three options within the "preferred corridor," which is basically an area which runs in nearly a straight east-west direction consistent with the beginning point and terminus of the already constructed Interstate 494 from Bloomington to the Mississippi River Bridge. The construction of the selected alternate B3 will result in the impairment of some wetlands, vegetation and wildlife, and the use of the completed interstate highway will to some degree contribute to air and noise pollution.

## THE FINAL ENVIRONMENTAL IMPACT STATEMENT

The final environmental impact statement (FEIS) for the Interstate 494 project was prepared by the personnel of MDOT and ultimately adopted by the Regional Federal Highway Administration on January 23, 1979. The Minnesota Environmental Quality Board (MEQB) approved the FEIS in February of 1979. A draft environmental impact statement (DEIS) had previously been released, and a public hearing was held on the DEIS in August of 1977. The plaintiffs took an active role in the public hearing with respect to the

DEIS, and made their specific objections known to agency planners. Incorporated in the FEIS is a "Final Section 4(f) Statement for Interstate 494," which is necessary because the proposed construction requires the use of land from Fort Snelling State Park. The FEIS and Final 4(f) Statement is a 233 page document replete with tables, diagrams, maps and analysis. The FEIS focuses on five basic alternatives—alternates B1, B2 and B3 (all located within the preferred corridor), alternate A (which is variously referred to as the "historic" alternate and incorporates T.H. 110 in its design) and the "no build" alternative. The selection of alternate B3 by the defendants was consistent with the Metropolitan Council's transportation plan and local and regional comprehensive plans, as well as the initial interstate highway construction proposals which originally surfaced in 1958.

## NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

The plaintiffs have challenged the adequacy of the FEIS from both a procedural and substantive standpoint under NEPA. Plaintiffs have supplemented their arguments by filing affidavits authored by Gunnar Isberg (now a professional planner and former Director of Planning for Dakota County) and Thomas Loucks (a land use planning consultant for the City of Sunfish Lake). Plaintiffs contend that the FEIS is procedurally and substantively defective because the FEIS fails to demonstrate a need for the highway construction, omits a good faith analysis of alternatives, and fails to analyze certain secondary impacts, specifically the impact of noise on future residential development and the impact of future urbanization engendered by the construction.

In this circuit, a plaintiff may obtain a preliminary injunction

upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief.

*Fennell v. Butler,* 570 F.2d 263, 264 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978). The Court has determined that under either test of *Fennell,* plaintiffs have failed to demonstrate that a preliminary injunction halting construction should issue.

Section 102(c) of NEPA provides in part that all federal agencies shall

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(c). The Eighth Circuit has articulated the purposes of the environmental impact statement mandated by NEPA to be threefold: 1) a requirement that the agency compile an "environmental record from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect"; 2) the EIS serves as a "full disclosure tool" to provide information with respect to a project's environmental costs; and 3) the EIS "ensures the integrity of the process by requiring *reasoned* analysis" with regard to environmental issues. *MPIRG v. Butz,* 541 F.2d 1292, 1299–1300 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977); *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 351 (8th Cir. 1972). The EIS thus serves as a decisionmaking instrument which the agency is under a good faith obligation to utilize

in its decisions with respect to "major Federal actions." 42 U.S.C. § 4332. There is no dispute here as to whether the contemplated construction is a major federal action for purposes of Section 102 of NEPA.

 The adequacy of an environmental impact statement is subject to challenge on both procedural and substantive grounds. In the procedural review context, the discussion of environmental effects and alternatives must reflect that the agency acted with good faith objectivity. *MPIRG v. Butz,* 541 F.2d 1292 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). In this regard, the discussion of environmental effects passes muster under NEPA if the information outlined in the impact statement is "sufficient to put interested persons, including decisionmakers, on notice as to significant consequences to be expected from the proposed action." *Sierra Club v. Froehlke,* 534 F.2d 1289, 1296 (8th Cir. 1976) *citing Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir. 1973). Further, while NEPA requires an exploration by the agency of all reasonable alternatives, including whether the proposed action should be undertaken at all, the act does not require a discussion of remote possibilities. *Robinson v. Knebel,* 550 F.2d 422 (8th Cir. 1977); *Natural Resources Defense Council, Inc. v. Hughes,* 437 F.Supp. 981 (D.D.C.1977), *modified,* 454 F.Supp. 148 (D.D.C.1978). In short, for an environmental impact statement to be adequate, it must contain sufficient information to permit a reasoned choice of alternatives. *MPIRG v. Butz,* 541 F.2d 1292 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977). With respect to substantive review of an agency's decision to proceed with a specific course of action, the role of the courts is very confined. This Court cannot substitute its own judgment for that of the agency. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *MPIRG v. Butz,* 541 F.2d 1292 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977). In this regard, the role of this Court is limited under NEPA to determining whether the agency's "actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values." *MPIRG v. Butz,* 541 F.2d 1292, 1300 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977); *Calvert Cliffs' Coordinating Committee, Inc. v. U. S. Atomic Energy Com'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (D.C.Cir. 1971).

 One of plaintiffs' principal complaints is that the FEIS fails to adequately discuss the "no build" alternative and that the defendants have failed to demonstrate a need for the proposed construction. In this respect plaintiffs contend that the FEIS utilizes "circular" arguments and outdated population projections to establish that the contemplated construction is necessary. Plaintiffs contend that as the 1975 population predictions for northern Dakota County were revised by the Metropolitan Council in 1977, and the 1977 revision substantially reduced the population projections, the FEIS is inadequate because it relied on the 1975 projections. A closer reading of the FEIS indicates that the revised projections were incorporated in the FEIS in Table 3–2 on page 33. *See also* FEIS pp. 56, 155, 189–90. While it is undeniable that the 1977 projections predict a population for the year 2000 in the communities of Eagan, Mendota Heights, Inver Grove Heights, South St. Paul and Sunfish Lake of approximately 64,000 less than do the 1975 projections of the Metropolitan Council, these projections also indicate that the population of these five communities will increase by nearly 60 percent by the year 2000. In light of the already serious preexisting traffic congestion and safety problems of the project area's highways, the defendants concluded in the FEIS that the revisions in the population projections did not effect the need for the project but did indicate that a

lesser design than originally contemplated would be adequate. The selection of alternate B3 was due in part to the revisions in the Metropolitan Council's projections. FEIS p. 155. As the revision in the population projections were incorporated in the FEIS and considered by the agencies, the FEIS is not rendered inadequate. Nor does it appear that the decision of the agencies to continue with the project in light of the revised projections is arbitrary or unreasonable. *Monarch Chemical Works, Inc. v. Thone,* 604 F.2d 1083 (8th Cir. 1979).

■ The defendants rejected the "no build" alternative in the FEIS for the following reasons: 1) present traffic congestion and energy problems engendered by the project area's highway system; 2) an increase in air and noise pollution which would result from stop and go driving on the area's preexisting routes; 3) the present traffic safety problems existing as a result of the project area's highway system; 4) the "no build" alternative was contrary to the region's planned transportation system; and 5) the "no build" would result in "negative" impacts on planned development in the area. The FEIS adequately sets out the advantages and disadvantages of the "no build" option so that a "reasoned choice of alternatives" can be made. *MPIRG v. Butz,* 541 F.2d 1292, (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977). Merely because population and commercial development may increase in the vicinity of the construction does not render the decision of the agencies in rejecting the "no build" alternative so arbitrary as to be substantively unlawful under NEPA.

■ Plaintiffs also charge that the FEIS is inadequate because it fails to examine certain primary and secondary impacts which conceivably could result from the highway construction. In this regard, plaintiffs characterize both the expected increase in future development as a result of the highway construction and the impact of additional noise on future residential development as secondary impacts which the FEIS fails to adequately consider. With respect to the impact of noise on future residential development, the FEIS (after considering in some detail the noise impact on existing residential areas) notes that overall abatement plans are in the process of completion which will consider the effect of noise on both present and future residential development. FEIS, p. 86. The assessment will be available to local officials for use in land use planning. With respect to industrial and commercial development which will result from the planned construction, the FEIS discusses this secondary impact at some length with regard to natural resources, traffic, vegetation, wildlife, community services and central business districts. As the FEIS has alerted interested persons as to the nature and possible consequences of this somewhat amorphous secondary impact, the FEIS is not rendered inadequate in the procedural sense. *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976). To expect specific detailed reports from the agencies, as plaintiffs arguments seem to imply, as to impacts on residential or commercial development which has yet to occur and the magnitude of which is plainly unknown, would place an intolerable burden on the defendants. Such an expectation is contrary to the well settled principle that the touchstone in interpreting the adequacy of environmental impact statements is one of reasonableness. *Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060, 1067 (8th Cir. 1977); *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976).

■ The plaintiffs also submit that the FEIS fails to consider and adequately analyze alternatives to the proposed construction of Interstate 494.[1] Plaintiffs have suggested a number of construction routes which could serve as alternatives to the proposed construction. In the FEIS, defendants have considered five basic alternatives—the "no build," the "historic" alter-

---

1. As a part of this argument, plaintiffs again focus their energies on the inadequacy of the discussion of the "no build" alternative. The Court has already considered and rejected this aspect of plaintiffs' arguments.

nate or alternate A, and alternates B1, B2 and B3, all of which are located in the preferred corridor. Plaintiffs contend that upgrading the Mendota Bridge intersection, along with construction of an additional river crossing can serve as a viable alternative to the present proposal. Further, plaintiffs contend that upgrading T.H. 55 would be sufficient to handle present and future traffic needs. Agencies are under no obligation to consider in detail conceivable yet remote alternatives. *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (D.C.Cir. 1972). The defendants allude throughout the FEIS to the deficiencies in the present traffic system in northern Dakota County. Further, the discussion and decision of the rejected no build alternative was premised on existing transportation routes being upgraded and modified. Under the circumstances, these particular alternatives advocated by plaintiffs need not have been separately discussed in the FEIS.

With respect to the discussion of alternate A (the historic alternate) in the FEIS, the Court has determined that the FEIS presents sufficient information to permit a reasoned choice of alternatives, and that the rejection of alternate A was not so arbitrary as to be unlawful under NEPA.[2] Alternate A incorporates a major thoroughfare, T.H. 110, in its design along much of the proposed design. The FEIS discusses the advantages and disadvantages of alternate A at length, and concludes that the disadvantages outweigh the advantages. Although less impact on undeveloped land would occur with the adoption of alternate A, the FEIS concludes that the transformation of T.H. 110 into an interstate highway function would seriously impair development, from an economic standpoint and otherwise, in Mendota Heights. According to the FEIS, the loss of a local traffic thoroughfare would cause the construction of a 10 or 12 lane interstate facility were alternative A selected. Along with the fact that

the adoption of alternate A is contrary to the Metropolitan Council's transportation plan, all these reasons led the agencies to reject the historic alternate.

■ The Court has reviewed the FEIS and all the arguments raised by plaintiffs under NEPA. In conclusion, the Court, at this point in time, has determined that the FEIS reflects that the defendants' proposal was reached after good faith objectivity— and that the balance of costs and benefits struck by the agencies was not arbitrary and capricious under NEPA. *Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060 (8th Cir. 1977); *MPIRG v. Butz,* 541 F.2d 1292 (8th Cir. 1976), *cert. denied,* 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977). Thus, plaintiffs have failed to demonstrate a substantial probability of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation with respect to their claims under NEPA. *Woida v. United States,* 446 F.Supp. 1377 (D.Minn.1978). Plaintiffs are therefore not entitled to a preliminary injunction.

## PLAINTIFFS' PENDENT CLAIMS

In addition to the NEPA claims, plaintiffs have contended that the construction proposal of defendants is unlawful under state law, specifically the Minnesota Environmental Policy Act (MEPA), Minn.Stat. §§ 116D.01–.06, and the Minnesota Environmental Rights Act (MERA), Minn.Stat. §§ 116B.01–.13. The Minnesota Environmental Rights Act, in Minn.Stat. § 116B.04, articulates the basic standards of proof operative in suits challenging activity on environmental grounds under state law:

In any other action maintained under section 116B.03, whenever the plaintiff shall have made a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located

---

**2.** As a different standard of review as to the agencies' substantive decision to proceed is operative under plaintiffs' pendent claims, the Court's analysis under NEPA is not necessarily controlling. *See* Rodgers, *Environmental Law,* § 7.11, at 822 (1977). The Court expresses no opinion on the merits of plaintiffs' pendent claims.

within the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not constitute a defense hereunder.

Minn.Stat. § 116B.04. Similarly, the Minnesota Environmental Policy Act, in Minn. Stat. § 116D.04, subd. 6, provides:

> No state action significantly affecting the quality of the environment shall be allowed, nor shall any permit for natural resources management and development be granted, where such action or permit has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

The standard of judicial review with respect to the merits of an agency decision was articulated in *People for Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 867 (Minn.1978):

> Once a person or a group has made a prima facie showing that an agency's action or inaction will materially adversely affect protectible natural resources, before it can take that action, the agency must either rebut plaintiff's prima facie case or demonstrate as an affirmative defense that no feasible and prudent alternative exists and that its conduct will promote the public health, safety, or welfare.

*citing MPIRG v. White Bear Rod & Gun Club,* 257 N.W.2d 762 (Minn.1977). The *PEER* decision concerned the approval by the MEQC of a construction permit for a high voltage transmission line (HVTL) which would cause significant environmental destruction along what was known as Route 7. In rejecting the MEQC's decision to route the HVTL along Route 7, the Minnesota court analogized the "feasible and prudent alternative" standard of Minn.Stat. § 116D.04, subd. 6 and Minn.Stat. § 116B.04 to the principle of nonproliferation in land use planning. *People for Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 868 (Minn.1978). The *PEER* court expressed its conclusion as follows:

> We therefore conclude that in order to make the route-selection process comport with Minnesota's commitment to the principle of nonproliferation, the MEQC must, as a matter of law, choose a pre-existing route unless there are extremely strong reasons not to do so. We reach this conclusion partly because the utilization of a pre-existing route minimizes the impact of the new intrusion by limiting its effects to those who are already accustomed to living with an existing route.

*Id.* On the basis of MERA, MEPA and the *PEER* decision, plaintiffs argue that under state law, the rejection by the defendants of alternate A (the historic alternate) is unlawful, as alternate A incorporates in its design the preexisting route of T.H. 110, a major thoroughfare running in an east-west direction through northern Dakota County. In this regard, plaintiffs argue that because the utilization of this preexisting highway in the interstate construction would require less undeveloped land than the alternates in the preferred corridor and that defendants have not demonstrated a need for the proposed construction, the defendants' decision was substantively unlawful under MERA and MEPA.

█ As the construction of this 11 mile interstate highway necessarily involves

some impairment of the environment wherever it is situated, the issue under state law is whether the defendants can establish that no "feasible and prudent alternative" to the route selected exists and that the construction proposal will promote the "public health, safety, or welfare." In this regard, it is unclear under state law whether the standards announced in the *PEER* decision concerning the principle of nonproliferation and the utilization of preexisting routes applies as well to the construction of highways in general or under the present circumstances. *Cf. County of Freeborn by Tuveson v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976) (construction of a proposed highway enjoined under MEPA); Comment, 63 *Minn.L.Rev.* 707, 719 (1979) (discussion of *PEER* and the nonproliferation principle).

It is well established that a federal district court has power to exercise jurisdiction over pendent claims based on state law where a substantial federal claim is present, where state and federal claims derive from a common nucleus of operative fact and are such that the claims would ordinarily be tried in one proceeding. *United ed Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). It is equally settled that while a federal court has the power to exercise jurisdiction over the pendent claim, it need not invariably exercise this power:

· That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law . . . .. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*Id.* at 726, 86 S.Ct. at 1139. The Court has concluded that its discretion is best exercised by declining to assume jurisdiction over the pendent state claims. Although the Court is sensitive to the prospect of further delay, principles of abstention, comity and primary jurisdiction have compelled the conclusion that the discretion vested in the Court under *Gibbs* should be employed to dismiss the pendent claims.

Before the construction of the interstate highway is initiated, the defendants must obtain a number of permits from certain state agencies. Defendants must obtain an indirect source permit for air pollution from the Minnesota Pollution Control Agency. Minn.Stat. § 116.07, subd. 4a. Further, the defendants must renew an expired permit from the Minnesota Department of Natural Resources for encroachment upon Schmidt Lake, which will be partially filled in by the planned construction. Minn.Stat. § 105.42, subd. 1. In addition, the defendants must obtain a watershed drainage permit and possibly variances from noise pollution standards in order to proceed with the construction of Interstate 494.

Under Minnesota law, in any administrative proceeding where a proposal is challenged on the grounds that it is likely to cause pollution or impairment of the environment, the state agency is required to determine whether the provisions of MERA or MEPA will be violated. Minn.Stat. § 116B.09. In this administrative proceeding, any organization or natural person can intervene as a matter of right. Minn.Stat. § 116B.09. In the event the state agency utilizes a hearing examiner, all evidence submitted to the examiner must be certified to the agency, which is required to make an independent determination after reading the material included in the record. *People for Environmental Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council*, 266 N.W.2d 858, 873 (Minn.1978). If a permit is issued by the agency, a party who has intervened in the administrative proceeding may bring a declaratory judgment action in state court challenging the issuance of the permit as being unlawful under MERA and MEPA. Minn.Stat. § 116B.10, subd. 1.

█ The concept of primary jurisdiction involves the question of the timing of judicial review of agency action where both a court and an agency have authority over the subject matter of the action. Schwartz, *Administrative Law*, §§ 166–169 (1976). The principles underlying the doctrine of primary jurisdiction are somewhat analogous to the matter now before the Court. In short, the doctrine of primary jurisdiction involves the deferring of jurisdiction by the court to the agency's specialized competence in interpreting policy and factual circumstances in order to avoid inconsistent adjudication and to allow the agency to employ its specialized expertise. *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Texas and Pacific Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Minnesota has expressed a "paramount concern" for the protection of the environment. Minn.Stat. § 116D.04, subd. 6. In effectuating this concern, Minnesota has established an elaborate regulatory mechanism for permit procedures and has provided for judicial review of the issuance of permits. *See generally* Minn.Stat. chs. 105, 116, 116B, 116D. The agencies here have not only the expertise to develop and analyze the factual bases underlying the state legal issues under MERA and MEPA, but also have the power, by not granting the construction permits, to prevent the proposed construction. The overriding importance which Minnesota has placed in environmental policy mandates that the agencies entrusted with interpreting and administering state environmental policy be allowed to do so in the first instance without the involvement of a federal court. In this manner, the special competence of the state administrative agencies is allowed to function, and the potential for inconsistent decisions is minimized.

█ The concept of abstention [3] is essentially a collection of doctrines based on principles of comity. *BT Investment Mana-*

gers, Inc. v. Lewis*, 559 F.2d 950 (5th Cir. 1977). In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814–15, 96 S.Ct. 1236, 1244–1245, 47 L.Ed.2d 483 (1976), the Court articulated its views on the form of abstention known as *Burford* abstention:

Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 [, 79 S.Ct. 1070, 3 L.Ed.2d 1058] (1959), for example, involved such a question. In particular, the concern there was with the scope of the eminent domain power of municipalities under state law. * * *

In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. In *Burford v. Sun Oil Co.*, 319 U.S. 315 [, 63 S.Ct. 1098, 87 L.Ed. 1424] (1943), for example, the Court held that a suit seeking review of the reasonableness under Texas state law of a state commission's permit to drill oil wells should have been dismissed by the District Court. The reasonableness of the permit in that case was not of transcendent importance, but review of reasonableness by the federal courts in that and future cases, where the State had established its own elaborate review system for dealing with the geological complexities of oil and gas fields, would have had an impermissibly disruptive effect on state policy for the management of those fields.

[citations omitted]. Here, the issue of whether the defendants can establish that no "feasible and prudent alternative" to

---

**3.** The issue of abstention can be raised by the Court *sua sponte*. *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Urbano v. Board of Mgrs. of New Jersey State*

*Prison*, 415 F.2d 247, 254 n.20 (3d Cir.), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1969).

their construction proposal exists under MEPA, MERA and the *PEER* decision presents a rather difficult legal question under state law which undoubtedly transcends the immediate controversy before the Court. *See Kaiser Steel Corp. v. W. S. Ranch Co.*, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968); *Housatonic River v. General Electric Co.*, 462 F.Supp. 710 (D.Conn.1978). Moreover, the legal issue presented bears on state policy in an area in which Minnesota has expressed a "paramount concern." Minn.Stat. § 116D.04, subd. 6. In light of the necessity for state agency determinations as to the issuance of the required permits, and the opportunity of these plaintiffs to intervene and seek judicial review of the agencies' determinations, the Court can only conclude that the plaintiffs have viable opportunities to present their state claims within the context of an orderly mechanism created for the development and review of state environmental policy. In order to avoid needless disruption with the development of important state environmental policy, the Court has determined that sound judicial administration requires this court to refrain from exercising jurisdiction over the state law claims. *Kaiser Steel Corp. v. W. S. Ranch Co.*, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968); *Alabama Public Service Com'n v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Housatonic River v. General Electric Co.*, 462 F.Supp. 710 (D.Conn.1978); *Hendrickson v. Wilson*, 374 F.Supp. 865, 875–78 (W.D.Mich.1973). ▮▮▮ In conclusion, the Court has determined to exercise its discretion under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) to

dismiss the pendent claims based on state law. The unsettled and difficult nature of the state law issue can serve as a legitimate factor in a discretionary refusal to exercise jurisdiction over a pendent claim. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). When an unsettled state law issue is presented which concerns state policy in a vital area such as the protection of the environment and where federal review of the issue could be disruptive of the formation of state policy, the issue should be considered in the context of a state regulatory mechanism specifically created by the state for such a purpose.[4] *Housatonic River v. General Electric Co.*, 462 F.Supp. 710 (D.Conn.1978) (abstention ordered in plaintiffs' suit alleging violations of state environmental statutes where the action presented a difficult question of state policy with respect to the standing of plaintiffs and where a comprehensive state administrative structure existed for the purpose of developing Connecticut environmental protection policy).

Accordingly, IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction is denied. Furthermore, IT IS HEREBY ORDERED that the third, fourth, fifth, sixth, and seventh causes of action described in plaintiffs' first amended complaint for injunctive and declaratory relief are hereby dismissed without prejudice.

---

**4.** In the event the plaintiffs pursue their state law claims in state court against these defendants, the court is not unaware of the unsettled constitutional problems should a state court attempt to enjoin the "federal" defendants from proceeding with construction. *See, e. g., Pennsylvania Turnpike Comm'n v. McGinnes*, 179 F.Supp. 578 (E.D.Pa.1959), *aff'd per curiam*, 278 F.2d 330 (3d Cir.), *cert. denied*, 364 U.S. 820, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960); Hart

& Wechsler, *The Federal Courts and the Federal System*, at 429–30 (2d ed. 1973); Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 *Yale L.J.* 1385 (1964). However, as the "state" defendants are so integrally involved in the planning and execution of the construction proposal, and clearly subject to the equitable power of the state courts, this potential problem is not a compelling one.